UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

CHARLES GANSKE,

                          Plaintiff,                        Case No.: 1:19-cv-06943 - RA

          -against-                               Hon. Ronnie Abrams

LOUISE DAPHNE MENSCH,

                          Defendant.
-------------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT LOUISE MENSCH'S PRE-ANSWER MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Adam Stein, Esq.
COZEN O'CONNOR
45 Broadway, 16th Floor
New York, New York 10006
Tel: 212-453-3728
*Attorneys for Defendant,*
*Louise Daphne Mensch*

Of Counsel:
Adam I. Stein, Esq.
Farrell J. Miller, Esq.

## TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………………………….............1

FACTUAL BACKGROUND………………………………………………...............5

I.     THE PARTIES……………………………………………………….....5

   A.  Plaintiff……………………………………………………………….5

   B.  Defendant………………………………………………………………6

II.    The Tweets……………………………………………………….......6

   A.  Ganske's May 2018 Twitter Thread……………………………………….7

   B.  Defendant Mensch's July 27, 2018 Tweets……………………………………...9

ARGUMENT…………………………………………………………………9

I.     LEGAL STANDARDS……………………………………………….....9

   A.  Plaintiff's Pleading Burden Under Fed R. Civ. P. 12(b)(6)……………………….......9

   B.  Governing Standards For Pleadings Alleging Defamation………………………….10

   C.  Extrinsic Evidence The Court May Consider On This Motion…………………………...12

II.    DEFENDANT'S TWEETS ARE NEITHER DEFAMATORY OR ACTIONABLE…....13

   A.  Mensch's Statements Contain Words And Phrases That Are Not Capable Of
Being Proved True Or False And Are Therefore Not Actionable………………………...13

   B.  Defendant's Statements Are Non-Actionable Opinions…………………………………...15

      1.    Statements On Unmoderated Internet Forums Are Presumptively Opinion……...15

      2.    Mensch Disclosed The Basis For Her Personal Opinion,
"You Clearly Personally Spread Russian Bots"………………………………………...17

   C  Plaintiff's Implied Defamation Claim Fails As A Matter Of Law…………………………...18

III.     PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM SHOULD BE DISMISSED…...19

  A.   Plaintiff's Tortious Interference Claim Impermissibly Duplicates His Claim For Defamation Injury And Otherwise Fails To Properly Allege A Claim Under New York Law………………………............................................................................................19

      1.    Count II Seeks Damage Only For Reputational Harm…………………………...19

      2.    Count II Also Fails To State A Claim Of Relief Under New York Law………...20

          a.   Plaintiff Has Failed To Allege Facts Sufficient To Demonstrate The Existence Of An Employment Contract…………………………………………………......21

          b.   Plaintiff Has Failed To Allege Facts Sufficient To Demonstrate That Defendant Had Specific Knowledge Of Plaintiff's Employment Contract…………………...22

          c.   Plaintiff Has Failed to Allege Facts Sufficient to Demonstrate that Mensch Intended to Induce a Breach of Contract…………………………………………23

CONCLUSION…………………………………………………………………………...25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*600 W. 115lh St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 143-45 (1992)…………………………13

*ACLU of Mich. V. FBI*, 734 F.3d 460 fn. 3 (6th Cir. 2013)……………………………………....22

*Adelson* v. *Harris*, 973 F. Supp. 2d 467, 498 (S.D.N.Y. Sept. 30, 2013)……………….....11,15,17

*Alexander v. MGM Studios, Inc.,* 2017 U.S. Dist. Lexis 214497, at *9
(C.D. Cal. Aug. 14, 2017)…………………………………………………………………………...12

*Andrews v. Freemantlemedia N.A., Inc*., No. 13 Civ 5174, 2014 U.S. Dist. LEXIS 166242,
at *13 (S.D.N.Y. Nov. 19, 2014) *aff'd*, 613 Fed. Appx. 67 (2d Cir. Aug. 24, 2015)…………........10

*Armstrong v. Simon & Schuster, Inc.*, 85 N.Y. 2d 373, 380 (1995)………………………………19

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)………………………………………………………...10

*Balakrishnan v. Kusel*, 2009 U.S. Dist. Lexis 39394, at *37 (E.D.N.Y. 2009)…………………..21

*Balderman v. Am. Broad. Cos., Inc.,* 292 A.D.2d 67, 76 (N.Y. App. Div. 4th Dep't 2002)……...20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)…........10

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287,
295 (E.D.N.Y 2015)…………………………………………………………………………….........15

*Biospherics Inc. v. Forbes, Inc*., 151 F.3d 180, 186 (4th Cir. 1998)……………………….............14

*Biro v. Conde Nast, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012)*……………………………..…..11,12

*Bose v. Interclick, Inc.*, 2011 U.S. Dist. LEXIS 93663, at *29 (S.D.N.Y. Aug. 17, 2011)………21

*Brahms v. Carver*, 33 F. Supp. 3d 192, 198 (E.D.N.Y. 2014)………………………………...15,18

*Celle* v. *Philipino Reporter Enterprises Inc.,* 209 F.3d 163, 177 (2d Cir. 2000)...................10,11,15

*Chaker v. Mateo*, 209 Cal. App. 4th 1138, 1142 (2012)…………………………………………...16

*Chau v. Lewis*, 935 F. Supp. 2d 644, 657 (S.D.N.Y 2013)………………………………….11,15

*Clifford v. Trump*, 339 F. Supp. 3d 915, 926 (C.D. Cal Oct. 15, 2018)……………..............10,16

*Cohen* v. *Cowles Media Co.,* 501 U.S. 663, 671 (1991)……………………………………………20

*Condit v. Dunne*, 317 F. Supp. 2d 344, 356 (S.D.N.Y. 2004)……………………………….........12

*Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018)……………………………………………21

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991)…………………....12

*Dellafave v. Access Temps.*, 2001 U.S. Dist. LEXIS 97, at *24 (S.D.N.Y. 2001) ...…………… 23

*Depny* v. *St. John Fisher College,* 129 A.D.2d 972, 972 (N.Y. App. Div. 4th Dep't 1987)……...13

*DiFolco* v. *MSNBC Cable L.L.C.,* 831 F. Supp. 2d 634, 644 (S.D.N.Y. 2011)…………….......11

*Dillon v. City of New York, 704 N.Y.S. 2d 1,7 (1st Dept. 1999)* ……………………..…….........14

*Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006)……...12

*Fernandez v. Zoni Language Ctrs.*, No. 15-cv-6066 (PKC), 2016 WL 2903274, at
*3 (S.D.N.Y. May 18, 2016)…………..………………………………………………………….........12

*Flamm* v. *Am. Ass'n of Univ. Women,* 201 F.3d 144, 147-48 (2d Cir. 2000)……………………………15

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 229 (1974)…………………………………………...13

*Global Telemedia Int'l v. Doe 1*, 132 F. Supp. 2d 1261, 1264 (C.D. Cal. 2001)…………….........16

*Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970)……………………..11,15

*Gross v. New York Times Co.,* 82 N.Y.2d 146, 156 (1993)……………………………………11

*Harris v. Queens County Dist. Atty's. Office*, 2009 U.S. Dist. LEXIS 105912, at *29–30
(E.D.N.Y. 2009)…………………………………………………………………………………….23,24

*High Falls Brewing Co., LLC v. Boston Beer Corp.*, 513 Fed. Appx. 12 (2d Cir. 2013)………..24

*Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*,
311 F.3d 534, 549 (2d Cir. 2002)…………….......................................................................................12

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)……………………………………......3

*Jacobus v. Trump*, 51 N.Y.S. 3d 330, 343, (N.Y. Cty. Sup. Ct. 2017), aff'd,
64 N.Y.S.3d 889 (1st Dept. 2017) ………………………………………………………….16,17

*Jain* v. *Sees. Indus, and Fin. Mkts. Ass'n,* No. 08-cv- 6463, 2009 WL 3166684, at
*9 (S.D.N.Y. Sept. 28, 2009)……………………………………………………………………….20

*Kalyanaram v. Am. Ass'n of Univ. Professors at the N.Y. Inst. of Tech., Inc.*,
742 F.3d 42, 44 n.1 (2d Cir. 2014);(2)……………………………………………………….......12

*Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 550 (S.D.N.Y. 2018).................................................................................................................. 23

*Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987)……………………………………………15

*La Luna Enters., Inc.* v. *CBS Corp.*, 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999) ........................ 20

*Lebya* v. *Renger*, 874 F. Supp. 1218, 1221 (D.N.M. 1994)……………………………………...13

*Levin v. McPhee*, 119 F. 3d 189, 197 (2d Cir. 1997)……………………………….........3,11,15,18

*Liberty Lobby, Inc.* v. *Dow Jones Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988)…………….........11

*LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 495 (S.D.N.Y. 2002)…………………….......22

*Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, 2016 WL 1717218, at *6 (S.D.N.Y. Apr. 28,2016)………………………………………….....................................3,14

*Medtech Prods. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) ................................ 22

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990)…………………………………..........13

*Millar v. Ojima*, 354 F. Supp. 2d 220, 230 (E.D.N.Y. 2005) ....................................................... 21

*Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 38 (S.D.N.Y. 2018)……..13

*Mr. Chow of N.Y.* v. *Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985)……………………11

*Nicosia v. De Rooy*, 72 F .Supp. 2d 1093, 1103 (N.D. Cal 1999………………………………...18

*Noel* v. *Interboro Mut. Indem. Ins. Co.*, 31 A.D.2d 54, 55-56 (N.Y. App. Div. 1st Dept. 1968)................................................................................................... 20

*Pan Am. World Airways, Inc. v. Vetements, Inc.*, 2010 U.S. Dist. LEXIS 97713, *19-20 (S.D.N.Y. 2010)………………………………………………………………………………..21

*Partington v. Bugliosi*, 56 F. 3d 1147, 1156 (9th Cir. 1995)…………………………………...17

*Price v. Stossel*, 620 F.3d 992, 1004 (9th Cir. 2010)…………………………………………...17

*Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 318, 328 (S.D.N.Y. 2017)…………..24

*RainSoft v. MacFarland*, 350 F. Supp. 3d 49, 58 (D.R.I. Sept. 30, 2018)...……………………..16

*Risley v. Rubin*, 272 A.D.2d 198, 199, 708 N.Y.S.2d 377, 378 (1st Dep't. 2000)………………..21

*Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013)……………………………………………………………………………….22,24

*Roth* v. *United States,* 354 U.S. 476, 484 (1957)……………………………………........4,15

*S103 Inc. v. Bodybuilding .com, LLC*, 2008 WL 11348458, at *10 (D. Idaho May 1, 2008)........17

*Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993)……………………………………….23

*Sandals Resorts Int'l v. Google, Inc.*, 925 N.Y.S.2d 407 (1st Dept. 2011)……………………16

*Steinhilber* v. *Alphonse,* 68 N.Y.2d 283, 290 (1986)…………………………………………11

*Stepanov v. Dow Jones & Co., Inc.,* 987 N.Y.S.2d 37, 44 (1st Dep't 2014)……………………...19

*Tipping v. Martin*, 2016 WL 397088, *2-3 (N.D. Tex. Feb. 2, 2016)……………………........14

*United States v. Bradbury*, 111 F. Supp. 3d 918, 921 (N.D. Ind. 2015)……………………........16

*Vice v. Kasprzak*, 318 S.W.3d 1, 22 (Tex. App. 2009)……………………………………...14

*Unsworth v. Musk,* 2019 U.S. Dist. Lexis 186481 at *11-12 (N.D. Cal. Oct. 28, 2019)…...........12

*ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp. 2d 789, 801 (N.D. Cal. 2010), 433 F. App x. 547 (9th Cir. 2011)………………………………………………………………………………...10

## Other Citations--Statutes:

Fed. R. Civ. P. 12(b)(6)………………………………………………………………………1,9,10

## Other Citations--Websites:

*Former Devin Nunes' Aide Uses Nunes' Lawyer To File SLAPP Suit Against Politico*, Nov. 21, 2019, available at https://www.techdirt.com/blog/?tag=steven+biss. ........................................... 4

Kate Irby, *Devin Nunes' Lawyer Files Another Defamation Lawsuit, this time for White House Official*, McClatchy, Nov. 18, 2019, available at https://www.mcclatchydc.com/news/nation-world/national/regional/the-west/article237500834.html...................................................4

La Russophobe, "Is Russia Blog's Charles Ganske a Kremlin Agent?" available at https://larussophobe.worldpress.com/2009/06/01/editorial-is-russia-blogs-charles-gansk ..............5

Lyrissa Barnett Lidsky, et al., *Of Reasonable Readers and Unreasonable Speakers: Libel Law in a Networked World*, 23 Va. J. Soc. Pol'y & L. 155, 165 (2016)……………………………………17

Mike Masnick, *Former Devin Nunes' Aide Uses Nunes' Lawyer To File SLAPP Suit Against Politico*, Nov. 21, 2019, available at https://www.techdirt.com/blog/?tag=steven+biss..............................................4

Defendant, Louise Mensch ("Mensch"), by her attorneys, Cozen O'Connor,  submits this memorandum in support of her motion, pursuant to Fed. R. Civ. P. 12 (b)(6)  for an order dismissing Plaintiff's Complaint, together with the costs of this motion, disbursements and such other and further relief as the Court deems just and proper.

## INTRODUCTION[1]

This is a "Twibel"[2] case that should never have been brought. In May 2018, Plaintiff and several other Twitter users were engaged in a multi-day exchange that eventually came to include discussion of  Russia's use of social media as a tool for online influence operations. On May 20, 2018, one of the thread's participants posted, under the pseudonym "@Conspirator0", a tweet referring to  "an old website called 'Russia Blog'" and its possible linkage to automated  Twitter accounts commonly known as "bots." As reported by @Conspirator0:

> the site is now gone, but 206 accounts with links to it live on. Of these, 45 (23%) appear to be automated based on either 24/7 activity or posting 90+% of their tweets via automation services.

Although not named in the body of this tweet, Plaintiff promptly confirmed his past involvement with the site, stating 19 minutes later  that the "last post I made or edited on that site was July 2009, before I knew what Twitter [was] much less what Twitter bots were."[3] What followed was a continuing discussion on a variety of subjects, including as relates here, the appropriate use of Twitter data for research purposes, the qualifications of anonymous "data scientists," and differing and strongly held views concerning the reliability of their findings based on their funding – whether foreign sourced, or in Plaintiff's words regarding his own work,

---

[1] Unless otherwise noted, all documents referred to in Plaintiff's Complaint and/or furnished as exhibits are attached to the accompanying Declaration of Adam I. Stein, dated December 8, 2019 ("Stein Decl.") submitted in support of Defendant's motion. A true and correct copy of Plaintiff's Complaint is attached as Stein Decl. Ex. 1.

[2] The term *Twibel* is used to describe purported libelous statements posted on Twitter.

[3] A copy of Plaintiff's May 20, 2018 tweet and other relevant tweets from the subject May 2018 and July 2018 Twitter threads are collected in Stein Decl. Ex. 2.

"funded by Americans in the United States of America." In short, just another "spy vs spy" innuendo-laced slugfest that much, if not all of our social media discourse has become.

According to Plaintiff, approximately two months later, on July 27, 2018, defendant Mensch "came across" the conversation between Ganske and @Conspirator0, "interjected herself" and "knowingly falsified the statement that Ganske '*personally spread Russian bots*' in order to impugn Ganske's character and associate him with 'Russian' intermeddlers and propagandists." Compl. ¶ 14.[4]  Plaintiff contends that Mensch "used her @patribotics Twitter account to publish … false and defamatory statements about Ganske," including specifically that Ganske "had a 'public vendetta' against and a 'personal obsession' with … @Conspirator0 … [and] falsely implie[d] that Ganske employed deceptive means and used fake accounts ('Russian bots") to spread disinformation online." Compl. ¶s 10, 12. Plaintiff further alleges that by publishing her July 2018 tweets, Mensch "knew or should have known that her defamatory statements would be republished over and over by third-parties to Ganske's detriment" and that Mensch's false statements and her "tagging" of them to his employer have damaged Ganske and his reputation. Compl. ¶s 22 - 23, 30 - 31. Plaintiff alleges two claims for relief: Count I – Defamation; and Count 2 - Tortious Interference (specifically, that AP [Plaintiff's employer] terminated Ganske's employment because of Mensch's tweets.")[5].

In Twibel  cases, however, context is all, and as the tweets themselves show, Mensch's July 2018 posts are replete with subjective and imprecise words -- "public vendetta", "personal obsession", "xenophobic" – all signaling that these are non-actionable opinions that are being conveyed. Because they neither contain a "precise and readily understood meaning," nor are "capable of being proven true or false," they are all "expressions of opinion" entitled to the

---

[4] A copy of Defendant's July 27, 2018 "Russian bots" tweet that is the subject of this action and copies of her other July 27 tweets to Plaintiff are attached as Stein Decl. Ex. 3.
[5] *See* Compl. ¶17.

absolute protection of the First Amendment.  *Live Face on Web, LLC v. Five Boro Mold Specialist Inc*., 2016 WL 1717218, at *6 (S.D.N.Y. Apr. 28, 2016); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.").

Ms. Mensch's "bot-spreading" remark is protected for the further reason that she indicated, and by retweeting confirmed as the source for her opinion that Plaintiff "personally spread Russian bots" on his old site,  @Conspirator0's analysis showing that of the 206 Twitter accounts with links to the site, "45 (23%) appear to be automated based on either 24/7 activity or posting 90+% activity of their tweets via automation services." From this and the accompanying screen shot copying @Conspirator0's data – the  accuracy of which has never been challenged -- it is abundantly clear, and would be to any reader, that Mensch's opinion was based on the referenced "@Conspirator0 produced work" and not on any privately held facts about Plaintiff that she alone possessed. This by itself is dispositive: "[I]f a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997).

Finally, and purportedly relevant to all of Plaintiff's claims, are the Complaint's numerous references to Ms. Mensch's oft-expressed negative views regarding Russian bots and Plaintiff's apparent disavowal of that Country's extensively documented interference in our 2016 elections. Compl. ¶s 9, 14 (referring to Defendant as a "propagandist who, for over two years, heavily promoted the now completely debunked Russia collusion hoax" and resurrecting thirteen examples of her bot-related tweets).   Presumably, these references are intended to bolster Plaintiff's claim that Ms. Mensch's reference to "Russian bots" was intended as a short hand way of importing all of these previously expressed views into a single 140 character tweet and imputing them to Plaintiff. Although not expressly pled as the more difficult to prove claim of  "defamation by

implication", the problem with this theory is multifold: (1) it presumes a reader would have been aware of these opinions at all, (2) that he or she would have recalled these opinions in the moment or immediate aftermath of seeing Defendant's tweet, (3) that they would understand them as being intended to apply to Plaintiff and (4) that as opinions, they themselves are constitutionally protected speech and not actionable, as a matter of law. When scored against the more "rigorous" pleading standard governing implied defamation claims, *see e.g. Stepanov v. Dow Jones & Co., Inc.,* 987 N.Y.S.2d 37, 44 (1st Dep't 2014), it is clear no viable cause of action is stated.

As factually irrelevant as they are legally unavailing, the Complaint's prolix recitation of these tweets suggests a darker purpose than simply as filler for a baseless defamation claim against a fellow Twitter user. That purpose is to silence, intimidate and restrain, first by "punishing" Ms. Mensch for exercising her constitutionally protected free speech rights, and second Plaintiff's – and perhaps more likely his counsel, Mr. Biss' – politically partisan diktat that Ms. Mensch "cannot be allowed to continue to use Twitter as a means to spread her nasty lies" and demand that "a very strong message … be sent to prevent others from acting in a similar way." Compl. ¶2.[6] By attempting to suppress, rather than "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth* v. *United States,* 354 U.S. 476,

---

[6] Notably, Mr. Biss is the same lawyer who filed Congressman Devin Nunes' SLAPP suit against a satirical cow on Twitter, as well as the Congressman's assorted lawsuits against a variety of journalists and critics. *See* Kate Irby, *Devin Nunes' Lawyer Files Another Defamation Lawsuit, this time for White House Official,* McClatchy, Nov. 18, 2019, available at https://www.mcclatchydc.com/news/nation-world/national/regional/the-west/article237500834.html. As reported by Ms. Irby, "Biss 'files a lot of defamation cases and a lot of his clients tend to be Republican or right-leaning.'" The facts bear this out. In addition to his recently filed defamation suit against Politico on behalf of NSC staffer Kashyap Patel, and Nunes' even more recent suit against CNN, Mr. Biss "has filed five lawsuits on behalf of Nunes this year alleging that news organizations, Twitter, anonymous social media users and political consultants conspired against the California congressman." The common thread running through these and the other similar SLAPP/defamation suits Mr. Biss has brought, including this one against Ms. Mensch, is a deliberate and calculated attempt to "silence and intimidate [his client's] critics." *See* Mike Masnick, *Former Devin Nunes' Aide Uses Nunes' Lawyer To File SLAPP Suit Against Politico,* Nov. 21, 2019, available at https://www.techdirt.com/blog/?tag=steven+biss.

484 (1957), Plaintiff's Complaint strikes at the very heart of what makes our pluralistic society great. That Plaintiff does so while noisily exercising his own First Amendment right to vilify and bash Ms. Mensch in ways far more egregious than anything she had to say about him, describing her as "an unhinged purveyor of false statements," an intentional liar who "chose to manufacture and publish false and scandalous statements" using "violent, abusive [and] hateful language," and a "grifter who trolls" the internet using "Twitter as a means to spread her nasty lies," is beyond ironic.[7] It is also beyond what even remotely passes as a legitimate use of the parties' resources and time and, more importantly, the Court's. We therefore would respectfully ask that the Court consider an attorney fee award to cover Ms. Mensch's costs of responding to this unfounded, factually challenged and legally frivolous attack.

## FACTUAL BACKGROUND

### I.     THE PARTIES

#### A.     Plaintiff

Charles Ganske ("Ganske") is self-described "journalist", who at all relevant times herein was employed by the Associated Press ("AP") as its "Social Media UGC [user generated content] specialist in Chicago." Compl. ¶8.  Despite his allegation that "until he was smeared by Mensch, Ganske enjoyed an untarnished reputation in the journalism industry," the precise opposite is the case. Thus, Ganske in the past has been described by fellow Russia blogosphere members as a "moronic pretender", "an idiot", "ridiculous" and "an expert on creepy" who "spends his time tirelessly churning out material that might just as well have been written by the Kremlin itself."[8] His reputation as a "journalist" fares little better: "You could give the complete works of Mark

---

[7] *See* Compl. ¶s 1, 14, 21.
[8] *See e.g.,* La Russophobe, "Is Russia Blog's Charles Ganske a Kremlin Agent?" available at https://larussophobe.worldpress.com/2009/06/01/editorial-is-russia-blogs-charles-ganske-a... and comments thereto, a copy of which is attached for the Court's convenience as Stein Decl. Ex. 4.

Twain to this 'journalist' and his response would be: 'That's not his real name. So I must ask the obvious, is he REALLY a writer?' {Cut to CSGanskeAP muttering this to himself in the produce section while shoplifting a head of lettuce.}"[9]

### B.    Defendant

Louise Mensch is a British-born journalist, blogger, novelist and a former Member of the British Parliament. She resigned from Parliament in 2012, and moved to the United States, working as a freelance journalist and columnist for British papers. In 2014 she began working for News Corporation, launching its *Heat Street* website in February 2016. Since leaving *Heat Str*eet in December 2016, Ms. Mensch continued her journalistic work, publishing primarily on her blog *Patribotics*, which she launched in 2017, but also in the New York Times and the Spectator, as well as commentating on TV and radio. She also has published over a dozen best-selling novels in the UK. Ms. Mensch currently resides in Manhattan with her three school-age children.

## II.    THE TWEETS

The alleged defamatory statements  arise out of Mensch's joining in a July 2018 Twitter exchange between plaintiff, "@Conspirator0" and others, and their ensuing discussion of Ganske's involvement with a blog site  that @Conspirator0 believed showed links to automated Twitter accounts known commonly as "bots."  Ganske  was previously an editor of the site and Mensch's comments regarding bot activity on the site followed  on @Conspirator0's observation in a May 20, 2019 tweet,  that while "the site is now gone … 206 accounts with links to it live on. Of these, 45 (23%) appear to be automated based on either 24/7 activity or posting 90+% of their tweets via automation services."

---

[9] *See* May 27, 2018 tweet by @ZellaQuixote replying to @Conspirator0, @TEN_GOP and 5 others, Stein Dec. Ex. 5.

A.      **Ganske's May 2018 Twitter Thread**

On May 18, 2018, two days before @Conspirator0's "Russia Blog" tweet, Ganske tweeted

as part of an exchange with  another Twitter user under the pseudonym, "@Katestarbird" that:

> I see that an anonymous "data scientist" @Conspirator0 has been cited by
> @benimmo of @DFRLab and yourself regarding alleged tracking of
> disinformation on Twitter. How do you suggest reporters verify the veracity
> of the data said to be behind his charts?

This initial exchange -- which Mensch was not involved in -- was part of a broader

conversation concerning the proliferation of automated "bot" accounts on social media, and

included at this point Ganske's opinion, "strictly in my personal view, that there has been too much

deference by some journalists to black box data sets" when reporting on the issue.[10] Picking up on

Ganske's derisive use of "quotation marks" around "data scientist," on May 19, 2018

@Katestarbird tweeted in her fellow commentator's defense:

> For @conspirator0's work, the methods are fairly transparent & the account
> does a good job documenting (& will answer questions.). I agree that
> anonymity makes it hard to cite (e.g. in a publication) and that the rules/norms
> of real-time data science are not yet written.

@Katesbird's May 19th tweet followed what by then had become a somewhat shrill

exchange between Ganske and @Conspirator0 concerning their actual (as opposed to online)

identities, Ganske's "blocking" of @Conspirator0 from his account, @Conspirator0's questioning

of Ganske's practice of "tweeting at users you've blocked" and  other similar snipes. @Katesbird's

May 19  tweet also appeared on a second more populated thread Ganske was simultaneously

involved in that was discussing the politicization of research on the prevalence of Russian bots and

---

[10] A copy of this May 18, 2018 tweet is attached as Stein Decl. Ex. 6.

the potential corrupting influence of foreign funding in this area. Included on this thread, were the

following Ganske posts, among others:

- … At issue for me is why a particular anonymous personality is being boosted by a Washington FP think tank with deep pocketed corporate and foreign government donors.

- How do we know that verification is taking place, as opposed to 'this guy draws cool charts, I like his politics especially his attacking people I dislike politically as Kremlin stooges, so let's roll with it'?

- To bring it back to what started the discussion, the partnership of a major think tank which receives foreign government funding with Facebook which public doesn't yet know fully entails ought to fuel more skeptical questions reporting on DFLRLAB/#Bellingcat methodology. Peace.[11]

It was in the context of these and a string of similar-type tweets, that @Conspirator0

tweeted his previously discussed  May 20, 2018 post that:

> An old website called "Russia Blog" recently crossed the proverbial radar. The site is now gone, but 206 Twitter accounts with links to it live on. Of these, 45 (23%) appear to be automated based on either 24/7 activity or posting of 90+% of their tweets via automation services.[12]

The subject threads continued and eventually came to include, among others, the following

additional posts by Ganske:

- On May 23, 2018 replying to an as yet unidentified tweet by @Conspirtor0: "a distinction between what I did editing and recruiting writers for that site back then who've since gone on to many different things, and think tankers that like to cite your stuff, Senor Norteno is: all of the work was funded by Americans in the United States of America.

- On May 27, 2018 replying to @Conpirator0, @TEN_GOP and 5 others: "Time to re-up this thread for @RadioFreeTom a[nd] @NavalWarCollege professor who's complained with justification about … Atlanticist think tank-ers promoting the work of an anonymous 'data scientist'."

- On July 21, 2018 replying to @aaronjmate: "I've remarked before on Senor Norteno's anonymity while claiming to be a 'data scientist' and their propensity for trolling

---

[11] Copies of these tweets are attached as Stein Decl. Ex. 7.
[12] A copy of @Conspirator0's May 20 tweet is attached as Stein Decl. Ex. 8.

@POTUS supporters as 'alt-w---ers' after @AtlanticCouncil, @DFRLab, @benimmo cited him as a source on alleged #Russia n trolls/bots."

- On July 26, 2018 to a person or persons unknown: "'It's best to avoid protracted back-and-forth exchanges with angry people that become less constructive with each new round.' Good advice. Lots of anonymous trolls tweeting to @AP @APCentralRegion tonight. Blocked and moving on."[13]

### B.    Defendant Mensch's July 27, 2018 Tweets

As alleged by Ganske, approximately two months later, on July 27, 2018, defendant Mensch "came across the   conversation (thread) between Ganske and @Conspirator0 … interjected herself" and "knowingly falsified the statement that Ganske **'personally spread Russian bots'** in order to impugn Ganske's character and associate him with 'Russian' intermeddlers and propagandists." Comp. ¶ 14.  Mensch's tweets, of which there are three at issue, are as follows:

- On July 27, 2018 replying to @patribotics, @AP and three others: Data is agnostic. @conspirator0 has offered his work for peer review. Data scientists who review it, accept him as their peer. Factually, @AP should know your public vendetta is based on him calling out your old website in May. Archive.is/IrOtW His tweet and your reply: [screen shot of @Conspirator0 "Russia Blog" post and Ganske reply.]

- On July 27, 2018 replying to @patribotics, @AP and three others: I think @APCentralRegion should see the data on your personal obsession after @Conspirator0 produced work on your old website. Here is the string; I have archived it, too.

- On July 27, 2018 replying to @patribotics, @AP and four others: To this xenophobic tweet of yours, sir, I fear we must tell @APCentral "citation needed". You clearly and personally spread Russian bots on your own site; and @Conspirator0 work on it has sent you into a frenzy of tweeting and trying to discredit him.[14]

### <u>ARGUMENT</u>

## I.    LEGAL STANDARDS

---

[13] Copies of these tweets, including  Ganske's July 27, 2018 tweet confirming that "lots of" negative comments about him were being posted to his employer, @APCentralRegion, the day **before** Defendant Mensch first came on the scene, is attached as Stein Dec. Ex. 9.

[14] As previously noted, copies of Defendant's July 2018 tweets can be found at Stein Decl. Ex. 3.

### A.  Plaintiff's  Pleading Burden Under Fed. R. Civ. P.  12(b)(6)

Under Fed. Civ. P. 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard requires plaintiffs to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Twombly*, 550 U.S. at 555). In applying this standard, a court must ignore "mere conclusory statements" or legal conclusions; the Court may only consider the factual allegations in the complaint and determine whether they plausibly state a claim on which relief can be granted. *Id.* "[A] sheer possibility that a defendant has acted unlawfully" is not enough. *Id.* If a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Andrews v. Freemantlemedia N.A., Inc.*, No. 13 Civ. 5174, 2014 U.S. Dist. LEXIS 166242, at *13 (S.D.N.Y. Nov. 19, 2014), *aff'd*, 613 Fed. Appx. 67 (2nd Cir. Aug. 24, 2015) (quoting *Twombly*, Supra, 550 U.S. at 555).

If the plaintiff fails this standard and "it is clear that the complaint could not be saved by any amendment,"  leave to amend need not be given. *ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp. 2d 789, 801 (N.D. Cal. 2010), aff'd, 433 F. App x.547 (9th Cir. 2011) (dismissing defamation claim with prejudice and collecting cases doing same); *Clifford v. Trump*, 339 F. Supp. 3d 915, 928 (C.D. Cal Oct. 15, 2018) (denying plaintiff leave to amend defamation claim "because any amendment would be futile.").

### B.  Governing  Standards For Pleadings Alleging Defamation

Whether a statement is "defamatory presents a legal question to be resolved by the courts in the first instance." *Celle* v. *Philipino Reporter Enterprises Inc.,* 209 F.3d 163, 177 (2d Cir.

2000). A motion to dismiss, therefore, obligates the Court to make a threshold determination of whether "the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Levin v. McPhee,* 119 F.3d 189, 195 (2d Cir. 1997). Statements amounting to nothing more than "rhetorical hyperbole" or "epithet[s]" are not considered to be defamatory. *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14 (1970). Courts are required to make this determination "on the basis of what the average person hearing or reading the communication would take [the statement] to mean." *Steinhilber* v. *Alphonse,* 68 N.Y.2d 283, 290 (1986); *Mr. Chow of N.Y.* v. *Ste. Jour Azur S.A.,* 759 F.2d 219, 224 (2d Cir. 1985).

Courts also must construe the complained of statement "in the context of the *publication as a whole." Celle,* 209 F.3d at 177, the broader social context in which the statement is made, *Levin,* 119 F.3d at 197, and are obligated to avoid "hyper-technical parsing" of words for the purpose of identifying "possible facts that might form the basis of a sustainable libel action." *Gross v. New York Times Co.,* 82 N.Y.2d 146, 156 (1993). Similarly, courts should not strain to construe a statement as having defamatory meaning. *DiFolco* v. *MSNBC Cable L.L.C.,* 831 F. Supp. 2d 634, 644, 657 (S.D.N.Y. 2011). "Not every unpleasant or uncomplimentary statement … is defamatory." *Chau v. Lewis*, 935 F. Supp. 2d 644, 657 (S.D.N.Y 2013).

"Where possible, [courts should]  resolve defamation actions at the pleading stage." *Adelson* v. *Harris,* 973 F. Supp. 2d 467, 481 (S.D.N.Y. Sept. 30, 2013). There is "particular value" in doing so, "so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms." *Biro v. Conde Nast, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012).* Given the importance of these freedoms, "[w]here the question of truth or falsity is a close one, a court should err on the side of non-actionability." *Celle,* 209 F.3d at 188 (*quoting Liberty Lobby, Inc.* v. *Dow Jones Co.,* 838 F.2d 1287, 1292 (D.C. Cir. 1988)). Finally, and for similar reasons, if the Court were to find  that some of the statements are actionable but others are

not, it should "dismiss the claims based on the nonactionable statements." *Biro,* 883 F. Supp. 2d at 457.

### C.  Extrinsic Evidence The Court May Consider On This Motion

On a Rule 12(b)(6) motion to dismiss, a court may consider: (1) "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit," *Kalyanaram v. Am. Ass'n of Univ. Professors at the N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014); (2) documents that are "integral to the complaint," even when the plaintiff "chooses not to attach [the document] to the complaint or incorporate [the document] by reference," *Condit v. Dunne*, 317 F. Supp. 2d 344, 356 (S.D.N.Y. 2004) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991)); (3) "any statements or documents incorporated . . . by reference" in the pleading, *Kalyanaram*, 742 F.3d at 44 n.1; and (4) "matters of which judicial notice may be taken." *Id.*

Among the matters of which a court may take judicial notice are public online postings, including "information publicly announced on a party's website." *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006); *see also Fernandez v. Zoni Language Ctrs.*, No. 15-cv-6066 (PKC), 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts may also take judicial notice of information contained on the websites where 'the authenticity of the site has not been questioned.'") (internal citations omitted); *Unsworth v. Musk,* 2019 U.S. Dist. Lexis 186481 at *11-12 (N.D. Cal. Oct. 28, 2019*)* (taking judicial notice of a series of tweets "because the parties cannot reasonably question the existence of the …tweets.")*; Alexander v. MGM Studios, Inc.,* 2017 U.S. Dist. Lexis 214497, at *9 (C.D. Cal. Aug. 14, 2017) (taking judicial notice of Twitter account screenshots)*; Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002).

## II.   DFENDANT'S TWEETS ARE NEITHER DEFAMATORY NOR ACTIONABLE

### A.   Mensch's Statements Contain Words And Phrases That Are Not Capable Of Being Proved True Or False And Are Therefore Not Actionable.

Only false statements of fact can be defamatory. This is because "[u]nder the First Amendment there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 229 (1974). Statements that cannot, *on their face,* be proven true or false are not capable of defamatory meaning. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19-20 (1990). Moreover, even where a statement can in its most literal sense be proved true or false, the First Amendment nonetheless "provides protection for statements that cannot reasonably be interpreted as stating actual facts about an individual." *Id.* at 20. A statement of fact is one that is reasonably understood to be supported by underlying and undisclosed first-hand information. *See, e.g. Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 38 (S.D.N.Y. 2018) (finding a statement non-actionable because the speaker "did not imply that she knows certain facts, unknown to the audience, which supported her opinion").

Statements that are not capable of being proved either true or false include language that is loose, figurative, hyperbolic, or otherwise too vague to impart factual information. *600 W. 115lh St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 143-45 (1992). Invective, name-calling, and epithet are also "not to be taken literally and not deemed injurious to reputation." *Depny* v. *St. John Fisher College,* 129 A.D.2d 972, 972 (N.Y. App. Div. 4th Dep't 1987). Assertions that conduct is "illegal," "fraudulent," or smelling of "bribery and corruption" can, in context, be too loose, figurative, or vague to constitute assertions of fact. *Von Gutfeld,* 80 N.Y.2d at 143-45.

Decisions contextualizing just what is and what is not defamatory abound: Thus, a statement to plaintiff's supervisor that plaintiff "did not have the full support" of his colleagues

13

has been found incapable of defamatory meaning. *Lebya* v. *Renger,* 874 F. Supp. 1218, 1221 (D.N.M. 1994). Similarly, a statement implying that the plaintiff was not "upstanding" was not actionable because it was not possible for the reader to determine exactly what was meant by the term "upstanding," *Dillon v. City of New York, 704 N.Y.S. 2d 1,7 (1ˢᵗ Dept. 1999)*; *see also Vice v. Kasprzak,* 318 S.W.3d 1, 22 (Tex. App. 2009) (statement that plaintiff engaged in unethical behavior is a statement of "individual judgment that rests solely in the eye of the beholder"); *Tipping v. Martin*, 2016 WL 397088, *2-3 (N.D. Tex. Feb. 2, 2016) (statement that plaintiff was a "whore" and "journalistic slut" was nonactionable because the audience would not have believed the speaker to have had "any knowledge concerning [the plaintiff's] personal life  or the quality of her work as a journalist").

Applying these principles and holdings, it is readily apparent that none of the statements complained of by Plaintiff impart any factual information at all and are otherwise incapable of defamatory meaning because they amount to loose, figurative, hyperbolic, or invective language. "Public vendetta",   "personal obsession" and "xenophobic" are all imprecise words clearly indicating that subjective opinions are being conveyed (and in the case of Defendant's use of "xenophobic," was directed ***not*** at Plaintiff, but rather his tweet). *See* Complaint ¶ 10.  Because they neither contain a "precise and readily understood meaning" nor are "capable of being proven true or false," they are all "expressions of opinion … entitled to the absolute protection of the First Amendment." *Live Face on Web, LLC v. Five Boro Mold Specialist Inc*., 2016 WL 1717218, at *6 (S.D.N.Y. Apr. 28, 2016); *Biospherics Inc. v. Forbes, Inc*., 151 F.3d 180, 186 (4ᵗʰ Cir. 1998) (holding that in light of the "tenor, language, and context" of the article, the challenged statements were not defamatory because a reasonable reader would not view them as stating actual facts about the plaintiff.).

Here, a reasonable reader would not have believed that when she chimed in on the thread, Ms. Mensch was conveying that she possessed private knowledge that Plaintiff was a personally obsessed xenophobe frenetically engaged in a public vendetta against a fellow – and anonymous – Twitter user that neither of them had met. Mensch's statements were thus necessarily imaginative jibes; and even if offensive, such speculations are by their nature opinions fully protected by the First Amendment. *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 13-14 (1970); *Chau v. Lewis*, 935 F. Supp. 2d 644 (S.D.N.Y 2013).

## B.    Defendant's Statements Are Non-Actionable Opinions

It is adamantine law that "expressions of opinion are not actionable." *Levin,* 119 F.3d at 196. They are protected by the First Amendment "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth* v. *United States,* 354 U.S. 476, 484 (1957).[15]   "Words which, taken by themselves, would appear to be a positive allegation of fact, may be shown by the context to be a mere expression of opinion or argumentative influence." *Adelson* v. *Harris,* 973 F. Supp. 2d 467, 498 (S.D.N.Y. Sept. 30, 2013). Context therefore is paramount and by itself can be dispositive.  *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) ("Context does resolve the matter."); *see also Brahms v. Carver*, 33 F. Supp. 3d 192, 198 (E.D.N.Y. 2014) ("The upshot is that context is key"). This clearly is the case here.

## 1.   Statements On Unmoderated Internet Forums Are Presumptively Opinion.

"New York Courts have consistently protected statements made in online forums as statements of opinion rather than fact." *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y 2015) (collecting cases demonstrating that online posts and

---

[15] The New York Constitution goes even further than the First Amendment and "provides for absolute protection of opinions." *Celle,* 209 F.3d at 178; *Flamm* v. *Am. Ass'n of Univ. Women,* 201 F.3d 144, 147-48 (2d Cir. 2000).

blogs tend to be opinion). As opinions, Mensch's statements, all made online through Twitter, are presumptively protected under the First Amendment. Internet speech is unique: "Unlike many traditional media, there are no controls on [internet] postings." *Global Telemedia Int'l v. Doe 1*, 132 F. Supp. 2d 1261, 1264 (C.D. Cal. 2001). "The low barrier to speaking online allows anyone with an Internet connection to publish his thoughts, free from the editorial constraints that serve as gatekeepers for most traditional media of disseminating information." *Sandals Resorts Int'l v. Google, Inc.*, 925 N.Y.S.2d 407 (1st Dept. 2011).

Fairly stated, the format breeds informality, incivility and contempt. *See United States v. Bradbury*, 111 F. Supp. 3d 918, 921 (N.D. Ind. 2015) (recognizing Twitter as a place where "a lot of people spout off"); *Jacobus v. Trump*, 51 N.Y.S. 3d 330, 343, (N.Y. Cty. Sup. Ct. 2017), aff'd, 64 N.Y.S.3d 889 (1st Dept. 2017) ("The informal nature of conversation on Twitter tends to encourage people to talk more freely about others, including the spreading of rumors and potential falsehoods."). When signing on, Twitter users therefore expect to read opinion, not facts. *See RainSoft v. MacFarland*, 350 F. Supp. 3d 49, 58 (D.R.I. Sept. 30, 2018) (noting that "Twitter meltdowns" are an example of the "non-literal commentary [that has] become an integral part of social discourse.").

Applying these precepts, courts routinely find statements of apparent fact assume the character of opinion when posted on unmoderated internet forums generally and on Twitter specifically. *See, e.g., Clifford v. Trump*, 339 F. Supp. 3d 915, 926 (treating as "rhetorical hyperbole" a tweet accusing the plaintiff of lying and calling her a "total con job"); *Jacobus*, 51 N.Y.S. 3d at 334 (treating as opinion tweets that plaintiff had "begged" for a job and had twice been rejected); *Chaker v. Mateo*, 209 Cal. App. 4th 1138, 1142 (2012) (treating as opinion statements on internet message board that the plaintiff is a "deadbeat dad," "may be taking steroids," and "picks up street walkers and homeless drug addicts.").

16

The Complaint's histrionic allegations notwithstanding, Mensch's far less noxious statement to Plaintiff that you "personally spread Russian bots on your own site" is similarly non-actionable opinion and provides no basis for the defamation claim alleged. *See S103 Inc. v. Bodybuilding .com, LLC*, 2008 WL 11348458, at *10 (D. Idaho May 1, 2008) ("[I]n the context of Internet postings, and the casual dialogue that typically accompanies such 'cyber-smackdowns,' name-calling, hyperbole, and generally juvenile behavior is not unusual"); *Jacobus*, 51 N.Y.S. 3d at 339 (noting that insults "on social media have been held to warrant an understanding that the statements contained therein are vigorous expressions of personal opinion, rather than rigorous and comprehensive presentation of factual matter.").

### 2. Mensch Disclosed The Basis For Her Personal Opinion "You Clearly Personally Spread Russian Bots."

"[A]speaker who outlines the factual basis for [her] conclusion is protected by the First Amendment." *Price v. Stossel*, 620 F.3d 992, 1004 (9th Cir. 2010); *Partington v. Bugliosi*, 56 F. 3d 1147, 1156 (9th Cir. 1995) (If "the author presents the factual basis for his statement, [it] can only be read as a personal conclusion about the information presented, *not as a statement of fact*."). By attaching as a basis for her opinion @Conspirator0's May 23, 2018 tweet and the data supporting his assessment of bot activity of the Russia Blog site, and by hyperlinking to same, Mensch did precisely that.  Seen as "the twenty-first century equivalent of the footnote for the purposes of attribution in defamation law, [hyperlinking has] become a well-recognized means for an author [on] the Internet to attribute source," *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y 2013), aff'd, 876 F.3d 413 (2d Cir. 2017); it also "signals that an author has relied on underlying facts … and invites the reader to test the reasonableness of the author's interpretation

rather than accept it as gospel."[16]   Because Mensch's data driven July 27 tweets similarly and prominently disclosed the facts on which her opinion was based, Plaintiff's defamation claim fails for this reason as well.

Moreover, while a reasonable reader would infer from Mensch's linking to the original @Conspirato0 tweet her reliance on this post, there is no need for any such inference here: Mensch makes the point explicitly, tweeting minutes earlier: "Data is agnostic. @Conspirator0 has offered his work for peer review. Data scientists who review it, accept him as their peer."[17]   Importantly, Mensch made no reference in this tweet, or in any of her others, to any inside information or first-hand facts as providing the basis for her opinion; and her accompanying screenshotting and hyperlinking of @Conspirator0's May 23 post signaled to all reading it that her comments were mere opinion. *See e.g.*, *Nicosia v. De Rooy*, 72 F .Supp. 2d 1093, 1103 (N.D. Cal 1999 (reasoning that the presence of hyperlink meant that the plaintiff "adequately disclosed the facts underlying her conclusion" and the statements were therefore opinion). Having provided the basis of her opinion in this manner, no viable claim of defamation exists. *See Brahms v. Carver*, 33 F. Supp. 3d. 192, 200 (E.D.N.Y. 2014) (dismissing defamation claim because the internet posting "was accompanied by the news article on which it was so obviously based."); *Levin v. McPhee*, 119 F. 3d 189, 197 (2d Cir. 1997) ("[I]f a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable.").

## C.    Plaintiff's Implied Defamation Claim Fails As A Matter Of Law

Finally, to the extent that Plaintiff alleges that Mensch's Russian bot remark "falsely impl[ied]" that Ganske employed deceptive means and used fake accounts ('Russian bots') to

---

[16] *See* Lyrissa Barnett Lidsky, et al., *Of Reasonable Readers and Unreasonable Speakers: Libel Law in a Networked World*, 23 Va. J. Soc. Pol'y & L. 155, 165 (2016). Despite the importance of hyperlinks in internet defamation analysis, Plaintiff omitted including this link when pasting Mensch's e-mail into the body of his Complaint. *Compare* Compl. ¶ 10 with Stein Dec. Ex. 3.

[17] *See* Stein Dec. Ex. 3.

spread disinformation on line" (Compl ¶ 12), because allegations of "implied defamation,"[18] are subject to an even stricter standard under New York law than ordinary defamation, these too must be dismissed. *See Armstrong v. Simon & Schuster, Inc.*, 85 N.Y. 2d 373, 380 (1995). "To survive a motion to dismiss a claim for defamation by implication . . . the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov v. Dow Jones & Co., Inc.,* 987 N.Y.S.2d 37, 44 (1st Dep't 2014). Here, the Complaint merely asserts in conclusory fashion that Defendant "imputed to Ganske" the alleged inferences of "dishonesty, deception, bias, unethical behavior, and conduct that violated AP's code of conduct" (Compl. ¶12)—but pleads no facts to support that she so much as used, much less affirmatively intended or endorsed, any of this verbiage as applying to him. In fact, the complained of Tweet imparts none of the editorial baggage to "Russian bots" that Plaintiff ascribes and is otherwise anodyne. Accordingly, Plaintiff has failed to state a claim for defamation by implication, whether or however pled, and like Plaintiff's other claims provides no basis for avoiding dismissal.

## III. PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM SHOULD BE DISMISSED

### A. Plaintiff's Tortious Interference Claim Impermissibly Duplicates His Claim For Defamation Injury And Otherwise Fails To Properly Allege A Claim Under New York Law.

#### 1. Count II Seeks Damage Only For Reputational Harm.

As alleged in Plaintiff's tortious interference count, Mensch "intentionally interfered with Ganske's contract … by *inter alia* devising … and actively participating in the scheme to defame and injure Ganske by lying in the tweet [that] Ganske had 'personally spread Russian bots'" and that as a "direct and proximate result of Mensch's interference, Ganske suffered damage …

---

[18] *See e.g.* Complaint ¶s 14 and 21.

including … damage to reputation, prestige and standing…". Compl. ¶30-31. Because this Count by its terms seeks relief for defamation injury from the same tweet as in Count I, it too should be dismissed.

The futility of trying to avoid the strictures of the First Amendment in defamation cases by pleading the same reputational injury under the guise of an alternate tort claim is well-settled. *Cohen* v. *Cowles Media Co.,* 501 U.S. 663, 671 (1991) (plaintiff cannot recover by an alternative tort for injury to reputation when the limitations of the First Amendment are fatal to defamation claim); *see also La Luna Enters., Inc.* v. *CBS Corp.,* 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999) (tort claims based on the same injury as a defamation claim must be dismissed to prevent plaintiffs from "avoid[ing] the strict requirements for establishing a libel or defamation claim"). "Regardless of the label plaintiff places upon it, however, [the] cause of action is indistinguishable from the defamation cause of action." *Balderman* v. *Am. Broad. Cos., Inc.,* 292 A.D.2d 67, 76 (N.Y. App. Div. 4th Dep't 2002) (dismissing intentional tort claim for allegedly misleading editing which portrayed plaintiff as "unethical"); *Noel* v. *Interboro Mut. Indem. Ins. Co.,* 31 A.D.2d 54, 55-56 (N.Y. App. Div. 1st Dept. 1968) ("we look for the reality, and the essence of the action and not its mere name").

Here, Plaintiff's claim for relief specifically alleges that his damages arise as a direct and proximate result of Mensch's "improper methods, actions and practices, including acts that were … defamatory,  unethical, oppressive, over-reaching, fraudulent, hostile and sharp." Compl. ¶ 30. As plead, the injuries complained of (all of which stem from the same allegedly defamatory Twitter exchange), therefore, "flows from the effect on [Plaintiff's] reputation." *Jain* v. *Sees. Indus, and Fin. Mkts. Ass'n,* No. 08-cv- 6463, 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009). Consequently, because Count II likewise effectively sounds in defamation only, it too must be dismissed.

### 2.   Count II Also Fails To State A Claim Of Relief Under New York Law

To establish a claim for tortious interference with  contract under New York law, a plaintiff must show: "(i) the existence of a contract; (ii) defendants' knowledge of that contract; (iii) defendants' intentional inducement of a breach of that contract; (iv) a breach; (v) but for the defendants' actions, that contract would not have been breached; and (vi) damages." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018). Plaintiff's Complaint fails to satisfy these requirements in at least the following respects:

### a.   Plaintiff Has Failed to Allege acts Sufficient to Demonstrate the Existence of an Employment Contract.

Plaintiff's allegation, simply that he "had a valid employment contract with the AP," Compl. ¶ 28., is insufficient to satisfy the first element of the claim for tortious interference. "In order to state a claim [for tortious interference], the plaintiff is required to 'identify a specific contractual term that was breached.'" *Balakrishnan v. Kusel*, 2009 U.S. Dist. Lexis 39394, at *37 (E.D.N.Y. 2009); *see also Bose v. Interclick, Inc.*, 2011 U.S. Dist. LEXIS 93663, at *29 (S.D.N.Y. Aug. 17, 2011) (dismissing a tortious interference with contract claim where plaintiff failed to allege any "facts regarding the terms of the contracts"); *Pan Am. World Airways, Inc. v. Vetements, Inc.*, 2010 U.S. Dist. LEXIS 97713, *19-20 (S.D.N.Y. 2010) (dismissing tortious interference claim because plaintiff "does not in fact identify . . . a specific provision of any such agreement that Pan Am induced Lucas to breach."); *Millar v. Ojima*, 354 F. Supp. 2d 220, 230 (E.D.N.Y. 2005) (dismissing tortious interference claim because plaintiff failed to allege the "specific contractual term that was breached") (citing *Risley v. Rubin*, 272 A.D.2d 198, 199, 708 N.Y.S.2d 377, 378 (1st Dep't. 2000) (affirming dismissal where "Plaintiff's claims concerning breach of his employment contract by defendant university do not identify a specific contractual term that was breached")).

In sum, because Plaintiff's general allegation that he "had a valid employment contract with the AP" lacks the required specificity, it therefore fails to meet the minimal requirement for pleading a tortious interference claim and should be dismissed.

### b. Plaintiff Has Failed to Allege Facts Sufficient to Demonstrate that Defendant Had Specific Knowledge of Plaintiff's Employment Contract

Plaintiff's recitation that "Mensch had knowledge of Ganske's contract" does not satisfy the second element of the claim for tortious interference. This is true even after adding Plaintiff's unsupported allegation that Mensch knew because "of her OSINT research including her review of Ganske's Twitter account, @CGanskeAP".

To satisfy this element of a tortious interference claim, defendant must have "actual knowledge" of the existence of the specific agreement in question. *Roche Diagnostics GmbH v. Enzo Biochem, Inc.* 992 F. Supp. 2d 213, 211 (S.D.N.Y. 2013); *see also LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 495 (S.D.N.Y. 2002) (defendant "must have actual knowledge of the specific contract."). Moreover, "a general claim of [defendant's] knowledge" is insufficient, plaintiff must plead that the defendant "was aware of the limitations" of the contract in question. *Medtech Prods. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008).

Here, Plaintiff's Complaint attempts to shore up an otherwise bare allegation that "Mensch had knowledge of Ganske's contract" with the implausible assertions that Mensch obtained this knowledge by doing "OSINT research, including her review of Ganske's Twitter account @CGAnskeAP." Comp. ¶ 13. OSINT is simply an acronym for open-source intelligence, or intelligence collected from publicly-available sources. *See ACLU of Mich. V. FBI*, 734 F.3d 460 fn. 3 (6th Cir. 2013). In other words, Plaintiff suggests that his employment contract was publicly available, which is implausible. Even if true, that only suggests potential *constructive* knowledge (*i.e.* that Mensch should have or could have known), which is insufficient to satisfy this element

of the claim. *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) ("constructive knowledge is inadequate to demonstrate [defendant's] knowledge for purposes of tortious interference").

Moreover, the Complaint itself contradicts the claim that Mensch undertook research on Plaintiff, explicitly stating that Mensch "could easily have verified these facts [about Ganske] with a few simply Google searches . . . but Mensch chose to ignore the truth." Compl. ¶ 11 fn 2. "It is appropriate to dismiss a claim that is both unsupported and contradicted by other claims in the complaint." *Dellafave v. Access Temps.*, 2001 U.S. Dist. LEXIS 97, at *24 (S.D.N.Y. 2001) (citing *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (affirming dismissal of claim where plaintiff "made wholly conclusory and inconsistent allegations"). Viewing Plaintiff's public Twitter profile also would not support the conclusion that Mensch had "actual knowledge" of Ganske's employment contract.[19] The only allegation we have to draw from is that Ganske's Twitter handle included "AP." While one might plausibly draw the inference that Ganske therefore worked for the AP, Ganske does not explain how or why the profile would reveal the existence of an employment contract, much less what obligations the contract contained.

Because this element of the claim is unsupported by factual assertions, Count II must be dismissed.[20]

_____

[19] Although unclear, we assume that Plaintiff's allegation that Mensch "had knowledge of Ganske's contract" because of "her review of Ganske's Twitter account," refers to Ganske's Twitter *profile*. A profile "may . . . include a short biographical description; a profile picture, such as a headshot; a 'header' image, which appears as a banner at the top of the webpage; the user's location; a button labeled 'Message,' . . . ; and a small sample of photographs and videos posted to the user's timeline, which link to a full gallery." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 550 (S.D.N.Y. 2018).

[20] Plaintiff's claim is further undermined by his self-defeating admission that when notified that Ganske "was being subjected to targeted harassment by Mensch, AP's Social Media director, Eric Carvin, did not suggest to Ganske that he had done anything on Twitter to violate AP's Social Media Policy." Compl. ¶16. Having been cleared of whatever wrongdoing he claims Mensch falsely brought to his employer's attention, the lack of any causative link to Plaintiff's alleged dismissal is yet another formidable obstacle to his claim. The fact that according to Plaintiff "lots" of other Twitter "trolls" were complaining about him to @APCentralRegion **the night before** Mensch's July 27 tweets, renders his tortious interference claim even weaker still. *See* Stein Decl. Ex. 9.

### c. Plaintiff Has Failed to Allege Facts Sufficient to Demonstrate that Mensch Intended to Induce a Breach of Contract

It is not enough for a "plaintiff to merely state that [defendant] 'intentionally procured' the breach[ ] . . . plaintiff must allege facts that plausibly demonstrate [the defendant's] intent." *Harris v. Queens County Dist. Atty's. Office*, 2009 U.S. Dist. LEXIS 105912, at *29–30 (E.D.N.Y. 2009) (dismissing plaintiffs tortious interference with employment contract claim because plaintiff "fail[ed] to allege any facts to suggest that [defendant] actually *intended* to procure the breach"). Here, the Complaint's conclusion that Mensch's objective was to specifically get Ganske fired is unsupported by any facts. *See High Falls Brewing Co., LLC v. Boston Beer Corp.*, 513 Fed. Appx. 12 (2d Cir. 2013) (affirming denial of leave to amend claim of tortious interference because the proposed pleading did not show that the specific "target of the [defendant's] conduct was the [plaintiff's] contractual arrangements," and not some other, equally plausible, objective).

Plaintiff's conclusory allegation that Mensch tweeted to "get Ganske fired," Compl. ¶ 13, fails to allege specific intent to induce a breach of contract, and is therefore insufficient to state a claim for tortious interference. *See Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) (to satisfy this [intent] element, it is not enough that a defendant engaged in conduct with a third-party that *happened* to constitute a breach of the third party's contract with the plaintiff; instead, the evidence must show that the defendant's *objective* was to procure such a breach."); *Harris v. Queens County Dist. Atty's. Office*, 2009 U.S. Dist. LEXIS 105912, at *29–30 (E.D.N.Y. 2009) (dismissing plaintiffs tortious interference with employment contract claim because plaintiff "fail[ed] to allege any facts to suggest that [defendant] actually *intended* to procure the breach . . . It is not enough for plaintiff to merely state that [defendant] 'intentionally procured' the breaches . . . [plaintiff] must allege facts that plausibly demonstrate [defendant's] intent."); *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 318, 328

(S.D.N.Y. 2017) (denying leave to amend claim of tortious interference where the defendant "may have been aware" that a third party would breach his contract with the plaintiff, "but that alone does not imply that [the defendant] *targeted*" the breach of that contract. "It is not enough that a defendant engaged in conduct with a third-party that *happened* to constitute a breach of the third party's contract with the plaintiff; instead, a plaintiff must allege facts showing that the defendant's *objective* was to procure such a breach.")

Because this element of the claim is based solely on the unsupported conclusory allegation that Mensch's Twitter mentions showed her intent to induce a breach of Plaintiff's contract, and not on any factual assertions of intent, the Complaint's tortious interference Count must be dismissed for this reason as well.

## **CONCLUSION**

Defendant Mensch respectfully requests that this Court grant her judgment dismissing each of Plaintiff's claims, and issue an order in her favor dismissing Plaintiff's Complaint in its entirety, with prejudice, together with such other and further relief as the Court deems just and proper.

Dated:  New York, New York
         December 10, 2019

                                        **COZEN O'CONNOR**

                                        By   */s/ Adam I. Stein*
                                             Adam I. Stein
                                             Attorneys for Defendant Louise Mensch
                                             45 Broadway
                                             New York, New York 10004-3792
                                             (212) 453-3428
                                             adamstein@cozen.com

Of Counsel:
Adam I Stein
Farrell J. Miller

25