**USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:** 8-20-20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES GANSKE,

                          Plaintiff,

           v.

LOUISE DAPHNE MENSCH,

                          Defendant.

No. 19-CV-6943 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

     If the Internet is akin to the Wild West, as many have suggested, Twitter is, perhaps, the shooting gallery, where verbal gunslingers engage in prolonged hyperbolic crossfire. It is in this context of battle by tweet that the conduct at issue in this defamation case was born. Plaintiff Charles Ganske, a journalist, alleges that Defendant Louise Daphne Mensch, a blogger and former member of Britain's Parliament, defamed him and interfered with his employment as a result of a tweet that she posted on July 27, 2018 at 12:32 a.m. (the "Tweet"). Plaintiff alleges that Defendant's single Tweet, which "interjected" herself into an ongoing conversation between Plaintiff and a third party, who called himself @Conspirator0, contained numerous defamatory statements. Now before the Court is Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the Court concludes that the allegedly defamatory statements in Defendant's Tweet are nonactionable statements of opinion, the motion is granted.

**BACKGROUND**[1]

**I.     Extrinsic Evidence**

As an initial matter, Defendant asks the Court to take judicial notice of extrinsic evidence in reviewing her motion to dismiss. With her motion, she has submitted several exhibits on which she relies heavily in urging the dismissal of Plaintiff's claims. *See* Dkt. 22. Generally, "[i]n considering a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1992). A district court nonetheless "has the discretion to take judicial notice of internet materials." *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 670 n.1 (S.D.N.Y. 2017). For the foregoing reasons, the Court grants in part and denies in part Defendant's request to take judicial notice of the extrinsic evidence.

First, the Court will take judicial notice of Defendant's "Exhibit 3," which — in addition to the Tweet at issue here — displays two other tweets that Defendant posted on July 27, 2018, approximately twenty minutes before the Tweet, all of which related to the same topic. *See* Dkt. 22, Att. 6 (July 27, 2018 Tweets). These two other tweets are part and parcel of Defendant's "interject[ion]" into "the conversation (thread) between Ganske and @Conspirator0." Compl. ¶ 14. Therefore, to look only at the Tweet — rather than all three tweets posted during this twenty-minute span — would not provide the necessary or proper context for understanding Defendant's statements that morning. *See Condit v. Dunne*, 317 F. Supp. 2d 344, 357–58 (S.D.N.Y. 2004) (taking judicial notice of documents that "aid the Court in its determination of

---

[1] The following facts are taken from the complaint and, for the reasons explained below, Defendant's "Exhibit 3," and assumed to be true for purposes of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017). Although it is labeled as "Exhibit 3" on the docket and referred to as such in Defendant's motion, *see* Dkt. 22, Att. 6, the exhibit itself is entitled "Exhibit 2."

2

whether plaintiff states a claim for relief [for slander]" and that help "place [the defendant's] comments in the broader social context"). Courts are permitted to take judicial notice "of documents that are 'integral to the complaint'" and "of materials in the public record . . . for the limited purpose of noting what the documents state, rather than to 'prove the truth of their contents.'" *Hesse v. Godiva Chocolatier, Inc.*, No. 19-CV-972 (AJN), 2020 WL 2793014, at *3 (S.D.N.Y. May 29, 2020). Because Defendant's two other July 27, 2018 tweets are integral to the allegations in the complaint and necessary to place her comments in context, the Court will take judicial notice of Defendant's "Exhibit 3."

The Court will not, however, consider Defendant's other exhibits, including those displaying tweets posted by Defendant, Plaintiff, and third parties prior to July 27, 2018. *See* Def.'s Mot. at 12; Dkt. 22. The focus of the complaint is on Defendant's July 27, 2018 statements. While the two other tweets posted by Defendant that morning provide essential context for reviewing the Tweet's allegedly defamatory statements, tweets posted in the days and months prior to July 27, 2018 do not offer the same immediate relevance. Nor is it even clear whether Defendant's exhibits include all of the tweets posted during that time frame and thus provide a full picture of the Twitter communications between the parties prior to and on July 27, 2018. *See Oakley v. Dolan*, No. 17-CV-6903 (RJS), 2020 WL 818920, at *6 (S.D.N.Y. Feb. 19, 2020) (declining to take judicial notice of tweets because the defendants do not explain why this is "competent evidence that must be considered at the motion to dismiss stage instead of on a motion for summary judgment or at trial"). Accordingly, the Court considers on this motion solely Defendant's tweets of July 27, 2018, contained in Defendant's "Exhibit 3."[2]

---

[2] Plaintiff's effort to have this Court convert this motion to one for summary judgment and then promptly deny it is rejected. *See* Pl.'s Mot. at 2 n.1. Whether to convert a motion to dismiss to one for summary judgment is within a court's discretion. *See Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 216 (S.D.N.Y. 2005). Because "[n]ormally[] summary judgment is inappropriate before the parties have had an opportunity for discovery" and that

3

## II.     Factual Background

Plaintiff is a 37-year old journalist.  From 2005 to 2007, "[a]s part of his job, he edited a website, www.russiablog.org, wrote press releases, authored op-eds, and assisted in drafting fundraiser letters and grant applications."  Compl. ¶ 8.  After a hiatus from journalism, Plaintiff returned in March 2011 to work "as [the] Central Region Broadcast News Editor for the Associated Press ('AP') in Chicago, Illinois."  *Id*.  From 2016 to 2018, still at the AP, Plaintiff served as the "National Sports Broadcast Editor" and the "Social Media/UGC specialist in Chicago."  *Id.*  According to Plaintiff, "[i]n his seven-and-one-half years with the AP, [he] received positive evaluations from his colleagues in Chicago and London for his UGC work and dedication to acquiring user generated content with tact and professionalism" and had "an untarnished reputation in the journalism industry."  *Id.*

Defendant Mensch is a former member of Britain's Parliament and editor of Heat Street, "a 'news' site."  *Id.* ¶ 9.  Defendant is now "a full-time blogger" and "maintains and operates multiple Twitter accounts, including @LouiseBagshawe (suspended), @LouiseMensch, and @patribotics."  *Id.* ¶¶ 1, 9 (emphasis omitted).  Plaintiff asserts that "Mensch was one of the propagandists who, for over two years, heavily promoted the now completely debunked Russia collusion hoax" and that she "trolls Twitter and claims to expose 'Russian' influence on and off the platform."  *Id.* ¶¶ 9, 14.  According to Plaintiff, Defendant has "a reputation in the community in which she lives and works (*i.e.*, on Twitter and generally in New York) as being very untruthful."  *Id*. ¶ 4; *see also* ¶ 14 (alleging that "Mensch has a habit and routine practice of targeting persons with false claims that they are associated with Russians or Chinese").

On July 27, 2018, "Mensch came across the conversation (thread) between Ganske and

---

opportunity has not occurred here, the Court will not convert Defendant's motion.  *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 165 (S.D.N.Y. 2006).

4

@Conspirator0, and interjected herself." *Id.* ¶ 14. This litigation stems from Defendant's Tweet at 12:32 a.m. that day, sent from her @patribotics account:



*Id.* ¶ 10. Plaintiff alleges that this Tweet contains "false and defamatory statements about [him]" because neither he nor his tweets were "xenophobic"; he "never spread Russian bots on any

5

website"; "Russiablog.org was never [his] 'own' website"; and he "had no 'vendetta' or 'obsession' with anyone." *Id.* ¶¶ 10–11.  Plaintiff further claims that Defendant "deliberately tagged [Plaintiff's] employer, '@AP,' and published the tweet to '@APCentral' in order to interfere with and prejudice Plaintiff in his employment and get Plaintiff fired." *Id.* ¶ 13.

Prior to posting that Tweet, Defendant tweeted two times prior that morning in connection with the same exchange.  First, at 12:17 a.m., Defendant tweeted:



Dkt. 22, Att. 6.  Then, at 12:27 a.m., Defendant tweeted again:



*Id.*

After seeing Defendant's Tweet, "Ganske notified the AP that he was being subjected to targeted harassment by Mensch." Compl. ¶ 16. In response, "AP's Social Media director, Eric Carvin, did not suggest to Ganske that he had done anything on Twitter to violate the AP's Social Media Policy." *Id.* Nonetheless, on August 10, 2018, Ganske's employment was terminated, purportedly "because of Mensch's tweets." *Id.* ¶ 17.

Plaintiff filed this action on July 25, 2019, alleging defamation and tortious interference under New York law. On December 10, 2019, Defendant filed the instant motion to dismiss, *see* Dkt. 22, which Plaintiff opposed on January 3, 2020, *see* Dkt. 25.

**LEGAL STANDARD**

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [his] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). In answering this question, the Court must "accept[] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick*, 861 F.3d at 35 (internal quotation marks omitted).

**DISCUSSION**

**I.   Defamation**

Plaintiff contends that he was defamed because Defendant "used Twitter to make and publish false factual statements of and concerning Ganske" and that these "false statements have harmed Ganske and his reputation." Compl. ¶¶ 20, 23. Plaintiff alleges that Defendant's Tweet contains three separate allegedly defamatory statements: (1) "[t]o this xenophobic tweet of yours, sir, I fear we must tell @APCentral 'citation needed[]'"; (2) "[y]ou clearly personally spread Russian bots on your own site"; and (3) "@Conspirator0 work on it has sent you into a frenzy of tweeting and trying to discredit him." Compl. ¶ 10 (emphasis omitted). For the following reasons, the Court agrees with Defendant that these statements are expressions of opinions and not defamatory statements of fact.

8

### A. Legal Standard

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012). To successfully allege defamation under New York law, the following elements must be met: "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Although a jury determines if a plaintiff has been defamed, "[w]hether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 177 (2d Cir. 2000); *see also Biro*, 883 F. Supp. 2d at 457 (explaining that New York courts encourage the resolution of "defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms'").

Because "there is," however, "no such thing as a false idea," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974), courts are tasked "with distinguishing between statements of fact, which may be defamatory, and expressions of opinion, which 'are not defamatory; instead, they receive absolute protection under the New York Constitution.'" *Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15-CV-4779 (LTS), 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016) (quoting *Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 597 (S.D.N.Y. 2014)); *see also Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993) ("[F]alsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false."). To conduct this analysis, a court must consider "what the average person hearing or reading the communication would take it to mean" and "the context of the entire communication and of the

9

circumstances in which they were spoken or written." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986). To assist with distinguishing between a statement of fact and opinion, New York courts look to three factors:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F. Supp. 2d 279, 288 (S.D.N.Y. 2006) (quoting *Gross*, 82 N.Y.2d at 153).[3]

The Court's analysis here thus focuses on whether the Tweet included "a provable statement of fact," which — unlike a "statement[] of opinion" or a "[l]oose, figurative or hyperbolic statement[]" — can be "actionable as defamation." *Brahms v. Carver*, 33 F. Supp. 3d 192, 198 (E.D.N.Y. 2014); *see also Celle*, 209 F.3d at 178 (requiring courts to "decide as a matter of law whether the challenged statement is opinion").

### B. First Statement: Plaintiff's Tweet Was "Xenophobic"

Although Plaintiff does not specifically address this issue, the Court first considers whether the statement that Plaintiff's tweet was "xenophobic" is one of fact or opinion. Compl. ¶ 10.

In this instance, it is important to first account for the context in which this allegedly defamatory statement was made as this can "signal[] to the reader that what is being conveyed is likely to be opinion rather than fact." *Levin*, 119 F.3d at 196; *see also Flamm v. Am. Ass'n of*

---

[3] "While New York's tripartite inquiry therefore does and is intended to differ from the inquiry required under the First Amendment, we note that the thrust of the dispositive inquiry under both New York and constitutional law is 'whether a reasonable [reader] could have concluded that [the publications were] conveying facts about the plaintiff." *Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) (internal citations omitted). "The New York Court of Appeals has consistently found that the New York Constitution affords greater protection for statements of opinion than its federal counterpart." *Chau v. Lewis*, 935 F. Supp. 2d 644, 658 (S.D.N.Y. 2013).

10

*Univ. Women*, 201 F.3d 144, 150 (2d Cir. 2000) ("A court may also consider whether the 'general tenor' of the publication negates the impression that challenged statements imply defamatory facts about the plaintiff."). Here, the context is Twitter, an Internet forum. "New York courts have consistently protected statements made in online forums as statements of opinion rather than fact." *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015); *see also Brahms v. Carver*, 33 F. Supp. 3d 192, 199 (E.D.N.Y. 2014) (noting, in concluding that an allegedly defamatory statement is nonactionable opinion, that it "was made on an internet forum where people typically solicit and express opinions, generally using pseudonyms"); *Biro*, 2014 WL 4851901, at *4 (explaining that its dismissal of the defamation claim was "buttressed by the context of the publications in question: an online website that was essentially a blog"); *Versaci v. Richie*, 30 A.D. 3d 645, 649 (3d Dep't 2006) (concluding that an alleged defamatory statement was an opinion, in part, because it "was asserted on an Internet public message board, which, as characterized even by plaintiff, is a forum where people air concerns about any matter"); *see also Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 507 (S.D.N.Y. 2012) (explaining that statements published in "editorial formats . . . create the 'common expectation' that the communication would 'represent the viewpoint of [its] author[] and . . . contain considerable hyperbole, speculation, diversified forms of expression and opinion.").

In analyzing the unique context of statements made on Internet fora, courts have emphasized the generally informal and unedited nature of these communications. This context, as some courts have concluded, leads "readers [to] give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts." *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D. 3d 32, 44 (1st Dep't 2011) ("The culture of Internet

11

communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.'"). Like the other Internet fora discussed in the above-cited cases, Twitter's forum is equally — if not more — informal and "freewheeling." *Id.* As such, the fact that Defendant's allegedly defamatory statement that Plaintiff's tweet was "xenophobic," Compl. ¶ 10, appeared on Twitter conveys a strong signal to a reasonable reader that this was Defendant's opinion.

In addition to context, the Court must also consider the other factors: whether Defendant's comment that Plaintiff's tweet was "xenophobic" lacks "a precise meaning which is readily understood" or is "capable of being proven true or false." *Gross*, 82 N.Y.2d at 153. Although the term "xenophobic" does have a fairly clear meaning in the context of the Tweet, it is not capable of being proven true or false. *See 600 West 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 142 (1992) (holding that "[t]he allegation of 'denigration'" is not actionable because, "[w]hether defined as 'cast[ing] aspersions on' or 'belittl[ing][,]' . . . the term falls far short of any requirement of verifiability"). It is, rather, classic opinion that amounts to an "epithet[], fiery rhetoric, [and] hyperbole," which "signal[s] advocacy" and a partisan viewpoint. *Egiazaryan*, 880 F. Supp. 2d at 507. Defendant's comment, moreover, was a direct response to Plaintiff's earlier tweet, which referred to @Consiprator0 as "Senor Norteno" and insisted that "all of the work [for Russia Blog] was funded by Americans in the United States of America." Compl. ¶ 10. Plaintiff's use of the word "Senor" and heavy emphasis on America and Americans further supports the conclusion that Defendant's statement that Plaintiff's tweet was "xenophobic" was a reaction to — and personal opinion about — Plaintiff's own words.

Furthermore, the term "xenophobic" is, at a minimum, analogous to — if not, more "fiery rhetoric" than — other words that courts in this district have found to constitute "'rhetorical

12

hyperbole' and 'imaginative expression' that is typically understood as a statement of opinion." *See Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 312 (S.D.N.Y. 2017) (concluding that stating that the plaintiff "engaged in 'extortion, manipulation, fraud, and deceit'" is a "a vague statement . . . of the 'loose, figurative, or hyperbolic' sort that is not actionable for defamation"); *Biro*, 883 F. Supp. 2d at 463 (holding that "the use of the terms 'shyster,' 'con man,' and finding an 'easy mark' is the type of rhetorical hyperbole and 'imaginative expression' that is typically understood as a statement of opinion"); *Egiazaryan*, 880 F. Supp. 2d at 507 (finding the reference to the plaintiff as "anti-Semitic and anti-American" in a "hyperbole-laden opinion piece" not to be actionable); *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284 (1974) ("The . . . use of words like 'traitor' cannot be construed as representations of fact."); *Chau*, 771 F.3d at 129 ("[T]he epithets . . . 'sucker,' 'fool,' 'frontman,' 'industrial waste,' . . . and 'crooks or morons' . . . are hyperbole and therefore not actionable opinion."). A reasonable reader would likely view Defendant's reference to Plaintiff's tweet as "xenophobic" to be her opinion and not conveying any objective facts about Plaintiff. *See Treppel v. Biovail Corp.*, No. 03-CV-3002 (PKL), 2004 WL 2339759, at *12 (S.D.N.Y. Oct. 15, 2004) ("[A]n opinion may be offered with such excessive language that a reasonable audience may not fairly conclude that the opinion has any basis in fact.").

Accordingly, this first statement in Defendant's Tweet does not constitute a defamatory statement of fact that could serve as a basis for Plaintiff's defamation claim.

### C. Second Statement: Plaintiff "Spread Russian Bots"

The second statement — that Plaintiff "clearly personally spread Russian bots on [his] own site" — is likewise not actionable. Compl. ¶ 10. While its context alone again provides strong support for the notion that Defendant's statement conveys an opinion, the analysis as to

13

this statement differs in some respects from the first statement.  Unlike an allegation that a statement is racist or xenophobic, a statement about whether someone personally spread Russian bots is capable of being proven true or false.  Nonetheless, a statement of opinion "may yet be actionable if [it] impl[ies] that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader."  *Levin*, 119 F.3d at 197.  However, "if a statement of opinion . . . discloses the facts on which it is based . . . , the opinion is not actionable."  *Id.*

Defendant's Tweet provided her factual basis for stating that Plaintiff "clearly personally spread Russian bots on [his] own site" by referring directly to "@Conspirator0['s] work," which documented alleged bot activity on Russia Blog — the site for which Plaintiff formerly worked.  Compl. ¶ 10.  Indeed, only about twenty minutes before posting the Tweet, Defendant tweeted about @Conspirator0's work, stating that "@[C]onspirator0 has offered his work for peer review" and "[d]ata scientists who review it, accept him as their peer."  Dkt. 22, Att. 6.  With her tweet, she shared @Conspirator0's tweet, which described his findings that while Russia Blog "is now gone, . . . 206 Twitter accounts with links to it live on.  Of these, 45 (23%) appear to be automated based on either 24/7 activity or posting 90+% of their tweets via automation services."  *Id.*  Ten minutes after that, at 12:27 a.m., Defendant posted her next tweet, which again referred to @Conspirator0's data.  *Id.* ("@Conspirator0 produced work on [Plaintiff's] old website.").  Defendant even included a hyperlink to @Conspirator0's data on the alleged bot activity on Russian Blog.  *See id.*  As such, in asserting that Plaintiff had "clearly personally spread Russian bots" on Russia Blog, Defendant conveyed to the reader the factual basis — here, @Conspirator0's data on bot activity on Russia Blog — on which her opinion rested.

The inclusion of the hyperlink is particularly significant.  Several courts have determined that the inclusion of a hyperlink to a report or article in a communication shared on an Internet

14

forum is a sufficient means of disclosing a factual basis on which an opinion rests.  As Judge Oetken explained in *Adelson v. Harris*, "the hyperlink connects one to the source of the [person's] claims."  973 F. Supp. 2d 467, 485 (S.D.N.Y. 2013).  The hyperlink, Judge Oetken further noted, has become "the twenty-first century equivalent of the footnote for the purposes of attribution in defamation law, because it has become a well-recognized means for an author or the Internet to attribute a source."  *Id.* at 484; *see also Sandals Resorts Int'l Ltd.*, 86 A.D. 3d at 42–43 (concluding that statements in an e-mail were "pure opinion" because "each remark is prompted by or responsive to a hyperlink, that is, it is 'accompanied by a recitation of the facts upon which it is based'"); *see also Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103 (N.D. Cal. 1999) (holding that the inclusion of a hyperlink indicates that the defendant "adequately disclosed the facts underlying her conclusion that [the plaintiff] embezzled money").

In *Mirage Entertainment, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26 (S.D.N.Y. 2018), for instance, the court dismissed a defamation claim predicated on a tweet by artist Mariah Carey.  Agreeing with the defendants' argument that "the Tweet is not actionable because it was Carey's opinion," the court explained that it had "provided the basis for her opinion — the E! News article reporting that Carey's concerts had been cancelled" and thus "[i]t would be clear to any reader that Carey's opinion that her fans 'deserve better' was based on the contents of that article."  *Id.* at 38.  Therefore, "Carey did not imply that she 'knows certain facts, unknown to the audience, which support[ed] [her] opinion," but instead, "by linking to the E! News article, she provided the basis for her opinion[.]"  *Id.*

The same is true here, in that Defendant both referenced and hyperlinked to the data on which her opinion that Plaintiff  "clearly personally spread Russian bots on [his] own site" was

15

grounded.[4]  Compl. ¶ 10.  Accordingly, this statement is also not actionable.

### D. Third Statement: "@Conspirator0['s] Work . . . Has Sent [Plaintiff] Into a Frenzy"

The Court similarly rejects Plaintiff's claim of defamation with regard to the third portion of Defendant's Tweet — that "@Conspirator0['s] work on [the issue of bot activity on Russia Blog] has sent [Plaintiff] into a frenzy of tweeting and trying to discredit him." Compl. ¶ 10. For the reasons noted above, this statement is a clear-cut one of opinion, posted on Twitter and, notably, "interjected" into "the conversation (thread) between Ganske and @Conspirator0." *Id.* ¶ 14.  It is difficult to conjure a "precise meaning" for the statement that Plaintiff was "sent . . . into a frenzy of tweeting." *Qureshi*, 430 F. Supp. 2d at 288.  Indeed, Twitter limits a user's tweet to 140 characters, which thus encourages users to post multiple times in a short period.  It is common, therefore, for a user to post many times in a row.  Moreover, even if this statement could be construed as one of fact with a precise meaning, Plaintiff has not alleged how this statement is defamatory in nature.

Because all three of the allegedly defamatory statements in Defendant's Tweet are nonactionable statements of opinion, Plaintiff's defamation claim is dismissed as a matter of law.[5]

## II. Tortious Interference

Plaintiff next alleges that Defendant "intentionally interfered with Ganske's contract,

---

[4] If Plaintiff is further suggesting that it was defamatory for Defendant to refer to Russia Blog as "[his] own site," Compl. ¶¶ 10–11, that allegation too would fail.  An "average person . . . reading" that statement, particularly in the Twitter context, would not find it to be defamatory. *Steinhilber*, 68 N.Y.2d at 290.  Not only does Plaintiff himself acknowledge that he worked for Russia Blog, "edit[ing] [its] website . . . , wr[iting] press releases, author[ing] op-eds, and assist[ing] in drafting fundraiser letters and grant applications," Compl. ¶ 8, but he makes no allegations as to how this assertion defamed him.

[5] To the extent that Plaintiff also alleges a theory of implied defamation, this too fails for the same reason. *See Mooradian v. St. Francis Prep. Sch.*, No. 13-CV-3357, 2014 WL 11462720, at *5 (E.D.N.Y. Aug. 14, 2014) (rejecting an implied defamation claim "[b]ecause opinions are not actionable").

property rights and business expectations by, *inter alia*, devising, aiding, abetting and actively participating in the scheme to defame and injure Ganske by intentionally lying in the tweet, by fabricating a claim that Ganske had 'personally spread Russian bots' on a website, and by retweeting the false and defamatory statements to hundreds of thousands on Twitter." Compl. ¶ 30.  Specifically, he asserts that Defendant knew that he had "had a valid employment contract with the AP," *id.* ¶¶ 28–29, and that he was fired "[a]s a direct and proximate result of Mensch's tortious interference with contract, . . . suffer[ing] damages and incurred loss, including, without limitation, loss of income and business, damage to reputation, prestige and standing, court costs, and other damages," *id.* ¶ 31; *see also id.* ¶ 17 ("AP terminated Ganske's employment because of Mensch's tweets.").

Under New York law, the elements of a tortious interference with contract claim are "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach result in damage to the plaintiff."  *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996). "In order to state a claim [for tortious interference with a contract], the plaintiff is required to 'identify a specific contractual term that was breached.'"  *Millar v. Ojima*, 354 F. Supp. 2d 220, 230 (E.D.N.Y. 2005) (quoting *Risley v. Rubin*, 272 A.D.2d 198, 199 (1st Dep't 2000)).

Although Plaintiff has neglected to address this argument in his opposition brief, his tortious interference claim must be dismissed because it is duplicative of his defamation claim. A defamation cause of action has "broad reach" because, "unlike most torts, defamation is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished." *Morrison v. Nat'l Broad. Co.*, 19 N.Y.2d 453, 458 (1967).  As such, "New York law considers claims sounding in tort to be defamation claims, not only where those

17

causes of action 'seek[] damages only for injury to reputation,' but also where 'the entire injury complained of by plaintiff flows from the effect on his reputation.'" *Jain v. Sec. Indus. & Fin. Mkts Ass'n.*, No. 08-CV-6463 (DAB), 2009 WL 3166684, at *9 (S.D.N.Y. Sept. 28, 2009); *see also La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999) (dismissing a fraud claim because it "[wa]s based on the same alleged injury to [the plaintiff's] reputation as his defamation claim").

Although Plaintiff gives it a different label, his tortious interference "cause of action is indistinguishable from [his] defamation cause of action." *Balderman v. Am Broad. Cos.*, 292 A.D.2d 67, 76 (4th Dep't 2002) (dismissing a fraud claim "as duplicative of the defamation cause of action" because "[a]ny injury to plaintiff . . . is the result of the allegedly unfavorable portrayal of him in the broadcast"). In pleading tortious interference, his factual allegations are fully grounded on the same alleged dissemination of defamatory content via the Tweet on July 27, 2018 as the defamation cause of action. *See* Compl. ¶¶ 30–31. Therefore, here too, Plaintiff alleges only a harm that "flows from the effect on his reputation.'" *Jain*, 2009 WL 3166684, at *9. In other words, "the gravamen of [his] alleged injury in . . . th[is] non-defamation count[] is either harm to [his] reputation or harm that flows from the alleged effect on [his] reputation." *Jain*, 2009 WL 3166684, at *9. Without alleging an injury separate from the alleged reputational effects of the Tweet, Plaintiff's tortious interference claim is duplicative of his defamation claim. *See Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 730 (S.D.N.Y. 2014) ("[T]he factual allegations underlying the *prima facie* cause of action relate to the dissemination of allegedly defamatory materials; accordingly this cause of action must fail."); *Chao v. Mount Sinai Hosp.*, No. 10-CV-2869 (HB), 2010 WL 5222118, at *11 (S.D.N.Y. Dec. 17, 2010) ("Where tort claims essentially restate a defamation claim that has been dismissed on a motion to

dismiss, the tort claims must also be dismissed.").

Even if this claim were not duplicative, it still could not survive Defendant's motion to dismiss. Assuming *arguendo* that Plaintiff had sufficiently pled the first two elements of a tortious interference with contract claim — that is, the existence of an employment contract with the AP and that Defendant had actual knowledge of that contract — Plaintiff has not plausibly pled that Defendant intended to induce a breach of Plaintiff's employment contract with the AP. *See Finley*, 79 F.3d at 1294. As the Second Circuit has explained, "[i]t is clear that New York law emphasizes the requirement that a tortious interference with contract claimant establish that the defendant purposefully intended to cause a contract party to breach a particular contract." *Conte v. Emmons*, 895 F.3d 168, 172 (2d Cir. 2018). "It is not enough," therefore, "for [the] plaintiff to merely state that [the defendant] 'intentionally procured' the breaches of contract, or that 'the comments were motivated solely to inflict harm.'" *Harris v. Queens Cty. Dist. Atty's Office*, No. 08-CV-1703, 2009 WL 3805457, at *11 (E.D.N.Y. Nov. 9, 2009) (internal citation omitted).

Plaintiff's complaint is devoid of any plausible allegation that Defendant intended to interfere with his employment contract with the AP. The only allegations to support this assertion are that Defendant "had knowledge of Ganske's contract and employment," Compl. ¶ 29; Defendant "knew that her characterization of Ganske would immediately create reputational risk for the AP," *id.* ¶ 14; and that she "intentionally interfered with Ganske's contract," *id.* ¶ 30. But these allegations regarding Defendant's intent in posting the Tweet are no more than conclusory. "[I]t is not enough that a defendant engaged in conduct . . . that happened to constitute a breach of the third party's contract with the plaintiff." *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013). Plaintiff, therefore, fails to

19

plausibly allege that "[D]efendant's objective was to procure such a breach." *Roche Diagnostics GmbH*, 992 F. Supp. 2d at 221.

Accordingly, Plaintiff's tortious interference claim is also dismissed.[6]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted. Plaintiff may file an amended complaint if he has a good-faith basis to do so no later than September 20, 2020. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 22.

Dated: August 20, 2020
New York, New York

Ronnie Abrams
United States District Judge

---

[6] Plaintiff's tortious interference claim would also likely be dismissed for another reason. "[U]nder New York law, an at-will employment contract cannot form the basis for a tortious interference with contract action." *Balakrishnan v. Kusel*, No. 08-CV-1440, 2009 WL 1291755, at *11 (E.D.N.Y. May 8, 2009). Although the complaint does not state whether Plaintiff was an at-will employee, the Court may assume so in the absence of this allegation. *See id.* ("[T]he Court can assume that plaintiff was an at-will employee in the absence of specific allegations to the contrary."); *see also Millar*, 354 F. Supp. 2d at 230 ("Without a specific allegation to the contrary, the Court will assume that the Plaintiff were at-will employees," which generally "cannot give rise to a cause of action for tortious interference with a contract.").

20